**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 13-20866-CR-ROSENBAUM**

UNITED STATES OF AMERICA,

        Plaintiff,

v.

CARLOS LUNA RAMIREZ,

        Defendant.

_____/

<u>**ORDER ON MOTION TO SUPPRESS**</u>

This matter is before the Court on Defendant Carlos Luna Ramirez's Motion to Suppress Statements [ECF No. 14] and Ramirez's Additional Motion to Suppress [ECF No. 19]. The Court has carefully reviewed Defendant's Motions, all supporting and opposing filings, and the record. In addition, the Court held an evidentiary hearing on Defendants' Motions on December 13, 2013. *See* ECF No. 20. For the reasons set forth below, the Court now grants Defendants' Motions.

<u>***I.  Background and Factual Findings***</u>

Defendant Carlos Luna Ramirez is charged by Indictment with one count of possession of child pornography, in violation of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2). The Government obtained much of the evidence it intends to use against Ramirez through Ramirez's own statements to law-enforcement officers during the course of the execution of a search warrant on Ramirez's residence. Through the pending Motions to Suppress, Ramirez asserts that his statements did not result from a voluntary, knowing, and intelligent waiver of his rights, and, therefore, they must be suppressed.

On December 13, 2013, the Court held a hearing on Ramirez's Motions to Suppress. During

that hearing, Homeland Security Investigation Special Agent Timothy Devine, Miami Beach Police

Department Detective Jenny Velazquez, Miami-Dade Police Department Detective Jeannette Azcuy,

and Defendant Ramirez testified.  Based on their testimony, the Court finds the following facts to

have occurred in connection of the November 5, 2013, search of Ramirez's residence.

Agent Devine specializes in child-exploitation crimes.  Through the use of law-enforcement

software employed in child-exploitation investigations, Devine identified the Internet Protocol

address of a computer involved in downloading child pornography.  After determining that the

computer was located at 1495 Northeast 180th Street, North Miami Beach, law enforcement obtained

a search warrant to search that premises, believing that the owner of the property may have been the

individual involved in the child-pornography offense.  On the pending Motions to Suppress, Ramirez

does not challenge the validity of the search warrant.

When law enforcement arrived at the residence at approximately 6:30 a.m., Agent Devine

was in charge of the team that executed the search warrant.  Team members knocked and announced

their presence, waiting for someone to open the front door.  Juan Jarra, his brother, and their mother,

Herclea Perez, went to the front door and opened it.  Law enforcement detained them and entered

the residence.  During a security sweep, law enforcement found Ramirez in the bathroom.  At the

time, the bathroom door was closed, and law enforcement knocked and announced their presence.

Ramirez told the officers to wait a minute.  When Ramirez did not promptly open the door,

eventually, the officers entered the bathroom through the unlocked door.  Ramirez was wrapped in

a towel, and the officers restrained him, removing him from the residence while he was wearing the

towel.

Officers then took Ramirez, who was handcuffed behind his back, outside on the driveway,

leaning up against the residence, along with the other residents that they had removed from the dwelling. Vehicles were parked in the driveway, and according to all evidence presented during the hearing, people driving by the home did not have a clear view of Ramirez.

At the time that Ramirez was placed outside the residence, a secondary security sweep was performed. Thereafter, while Ramirez was sitting in the driveway, Agent Devine was organizing the search-warrant execution team, ensuring that the search of the residence was being video-recorded, coordinating and meeting with computer forensic agents to decide which computer to examine first, and speaking with other agents who were detaining residents, determining their legal status in the United States and ascertaining whether they had criminal histories.

At some point, Ramirez asked a Spanish-speaking individual to ask a law enforcement officer that Ramirez be permitted to put on some clothes. The officer agreed. An officer then took Ramirez back inside the house, where he obtained clothing from a packed suitcase[1] located in the room where the computer that allegedly was used to download the pornography was found. After Ramirez dressed himself, law-enforcement officers escorted him back outside the house, this time with his hands cuffed in front. Once again, Ramirez was placed in front of the garage with the other residents of the home.

Agent Devine instructed the computer-forensic analyst to conduct a preliminary analysis on the computer found in Ramirez's room. The analysis confirmed that the computer contained child pornography and peer-to-peer software often used to download such child pornography. Thereafter, Agent Devine took Ramirez from in front of the garage to Detective Velazquez's police vehicle to

---

[1]Ramirez is employed by a cruise operator, and he was scheduled to depart on a cruise that morning. Therefore, his suitcase was packed.

interview him.  Agent Devine and Detectives Velazquez and Azcuy all testified that Agent Devine

sat in the back seat with Ramirez, who was handcuffed in front, while Detectives Velazquez and

Azcuy were in the front seat of the car.  Agent Devine began speaking to Ramirez in English.  The

precise sequence of events once Ramirez was taken to the car is a matter of some controversy.  Based

on the evidence adduced at the hearing, however, the Court concludes that the following occurred:

Ramirez was asked what the law-enforcement witnesses described as "preliminary questions,"

including Ramirez's name, date of birth, address, and length of time at his address.  Detective

Velazquez testified to this sequence of events, as did Ramirez.  In addition, Detective Azcuy, who

took notes of the events as they occurred during the interview, wrote a report memorializing this

sequence of events.[2]

After Ramirez answered these questions, Ramirez indicated that he had difficulty

understanding, so Agent Devine asked Ramirez whether he would prefer to be spoken to in Spanish.

When Ramirez indicated that he would, Detective Velazquez primarily, but with occasional

questions from Detective Azcuy, conducted the rest of the proceedings in Spanish.  Ramirez claims

that Detective Azcuy was present for only a short period of the interview after Detective Velazquez

read Ramirez his rights and only because he requested another Spanish speaker since he stated that

_____

[2]During her testimony, Detective Azcuy at one point suggested that the officers also asked
Ramirez whether the computer that contained the child pornography was his before reading
Ramirez his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  Earlier in her
testimony, however, she did not so testify.  Following this statement, Detective Azcuy consulted
her handwritten notes of the interview and concluded that none of the so-called "preliminary
questions" were asked of Ramirez before he was *Mirandized*.  Based on the consistency of
Detective Velazquez's testimony, Ramirez's testimony, and Detective Azcuy's official report of
the interview, which she prepared within a day of the interview, this Court concludes that
Detective Azcuy was confused at the time that she testified regarding the sequence of events and
accepts the other evidence on this point.

he could not understand Detective Velazquez.  For reasons discussed later in this Order, this Court does not find Ramirez's assertions in this regard to be credible.

Detective Velazquez next read Ramirez his rights in Spanish from a standard Homeland Security Investigations Spanish *Miranda* rights form.  She further testified that after reading each specific right, she asked Ramirez whether he understood, and he said "yes" and nodded affirmatively.  At one point, Detective Velazquez attested, Velazquez became tongue-tied while attempting to pronounce the word "proporcionara," and Ramirez interjected, saying the word for her.  After Velazquez finished reading the form, she stated, she gave it to Ramirez, and she heard him read it to himself out loud before writing and signing his name to the form.

For his part, Ramirez claims that Detective Velazquez's Spanish was "very bad" and that he could not understand anything that she said after she read him the first three sentences of the *Miranda* form.  He further testified that although he was given the form, he could not read it because he was handcuffed but was nonetheless required to somehow sign the form.  According to Ramirez, he was told that if he did not cooperate and speak with the officers, "it would be worse" and that he could not cooperate unless he signed the *Miranda* form.[3]  Therefore, he felt that he had no choice but to sign, so he signed.  The Government did not present evidence suggesting that Ramirez's

---

[3]Ramirez's first Motion to Suppress [ECF No. 14] states that Ramirez "was . . . told it would be in his best interest to talk with the agents and tell them the truth." *Id.* at 3.  His second Motion to Suppress [ECF No. 19], filed after the testimony during the hearing on the first Motion to Suppress, describes the statement made to Ramirez as follows: "it would be bad for [Ramirez] not to cooperate and provide a statement."  ECF No. 19 at 3; *see also id.* at 4 (characterizing statement as "if you don't give a statement it will be bad for you").  No attorney questioned any law-enforcement witness about this alleged statement, and no law-enforcement officers gave testimony on this issue.  Because the only actual evidence in the record is that of Ramirez's uncontested testimony that he was told that "it would be worse" if he did not cooperate, the Court analyzes that version of events.

recollection that he was told that if he did not speak with the officers, "it would be worse" was inaccurate.

This Court does not find Ramirez's assertions that he did not understand Detective Velazquez to be credible.  First, Detective Velazquez, who is of Cuban heritage, testified that she speaks, reads, and writes fluently in Spanish.  Second, Detective Velazquez recalled that, at one point, well after she read the first three sentences of the form to Ramirez, Ramirez chimed in to help Detective Velazquez pronounce the word "proporcionara," indicating that he understood what she was saying.

Third, the only evidence of record reflects that Detective Velazquez did no more than read the rights to Ramirez from the Spanish form; she did not provide her own translation.  Thus, unless something was wrong with the translation on the form — a fact to which Ramirez did not testify, it seems extremely difficult to believe that Detective Velazquez's pronunciation could have been so bad as to preclude Ramirez from understanding her mere reading of the form.  This is particularly true in view of the fact that he did not testify to having any problem understanding Detective Velazquez's questions during the interview following the administration of the *Miranda* rights, and he exhibited no difficulty understanding either of the two interpreters during the hearing on his Motions, even though one testified that she originally learned Spanish in Cuba, and Ramirez testified that he is from Peru, and his attorney suggested that he could not understand Detective Velazquez because she spoke "Cuban American Spanish."  *See* ECF No. 19 at 3.  Moreover, both interpreters described the Spanish on the *Miranda*-rights as "standard Spanish,"[4] and Ramirez himself admitted

---

[4]To be clear, the Court did not ask the interpreters to opine on whether the Spanish *Miranda*-rights form was a fair and accurate translation of the *Miranda* rights.  At no point did anyone suggest that it was not, and this Court does not view the accuracy of the translation appearing on the Spanish *Miranda*-rights form to be an issue in controversy at this time.

that he understood the first three lines of the form as Detective Velazquez read them to him.  Thus, to believe that Ramirez did not understand Detective Velazquez's presentation of rights, this Court would have to believe that, after correctly reading three lines of the standard-Spanish *Miranda* rights form, Detective Velazquez, herself a Spanish speaker, suddenly lost the ability to read in Spanish in an intelligible way.  Even not considering Detective Velazquez's and Detective Azcuy's testimony that Ramirez both indicated that he understood each right after Detective Velazquez read it and that he read the form himself after Detective Velazquez read it, this is simply too much to ask.

Furthermore, Ramirez did not otherwise testify in a credible way.  He repeatedly avoided answering questions directly, contradicted himself and his written Motions, and even his own attorney had to instruct him at one point, "You have to give a straight answer. . . ."  Under these circumstances, the Court credits Detective Velazquez's version of the events during the interview, not Ramirez's.  Therefore, the Court concludes that Detective Velazquez read Ramirez his rights; Ramirez indicated that he understood them; Ramirez read his rights to himself; and Ramirez signed the *Miranda*-rights waiver form.  The remaining issues on the pending Motions to Suppress include the following: (1) Did the events preceding the taking of Ramirez to Detective Velazquez's vehicle for the interview render his subsequent statement involuntary?  (2) Are Ramirez's responses to the so-called "preliminary questions" asked before Ramirez was advised of his rights admissible?  (3) Did Detective Velazquez's alleged statement to the effect that "it would be worse" for Ramirez if he did not cooperate render Ramirez's statements involuntary?

## *II.  Discussion*

A.   *Did the events preceding the taking of Ramirez to Detective Velazquez's vehicle for the interview render his subsequent statement involuntary?*

Ramirez asserts that the events that occurred before he was taken to Detective Velazquez's vehicle for the interview broke Ramirez's will and rendered him unable to make a voluntary decision to waive his rights.  In this regard, Ramirez notes that he was removed from his residence while dressed in nothing more than a towel and was forced to stand outside the home in this attire for what Ramirez described as about forty minutes.  Because of the humiliating nature of this occurrence, Ramirez contends, Ramirez's subsequent waiver of his rights was not voluntary.

While the Court agrees with Ramirez that, as soon as the search-warrant team completed its security sweeps and concluded that Ramirez did not represent a security threat, it should have provided Ramirez with an opportunity to get dressed, the fact that it did not do so in this particular case did not taint Ramirez's statement.  First, the agents found Ramirez wrapped in only a towel — they did not require him to dress himself in a towel.

Second, based on the chronology of events, it is likely that Ramirez was outside in his towel for, at most, about thirty minutes.  Agent Devine testified that the execution of the search warrant began at 6:30 a.m.  At that time, agents knocked on the door of the residence, and three people other than Ramirez responded.  The agents removed them from the house and learned that Ramirez also resided within, and then the agents went to the bathroom where Ramirez had been showering.  Again, they knocked.  When Ramirez did not open the door, the agents entered.  Ramirez was then removed from the house.  At 7:15, Ramirez signed the *Miranda*-rights form in Detective Velazquez's car, but between that time and Ramirez's removal from the home, probably no earlier

-8-

than 6:35, Ramirez went back into the house, removed clothing from his packed suitcase, changed into clothes, and was escorted outside, where he again sat and waited for the agents to finally take him to Detective Velazquez's car.  It is unlikely that these events took less than ten minutes to occur. As a result, conservatively, it is unlikely that Ramirez sat outside in his towel for more than thirty minutes.

And, although this Court certainly does not condone or encourage law enforcement to have people remain outside their residences dressed in nothing more than a towel unless security, safety, or exigency requires it, in this particular case, the Court cannot find either that law enforcement made Ramirez stand outside in his towel for the purpose of trying to dehumanize or embarrass him or that Ramirez was actually intimidated by this turn of events to the point where his subsequent statement was not voluntary.  As noted above, law enforcement encountered Ramirez wrapped in only his towel when they were conducting their security sweep.  For the team's safety, Ramirez was immediately removed from the residence as he was found while law enforcement conducted the rest of its security sweep.  Immediately after law enforcement completed its two security sweeps, Agent Devine testified, he had to undertake organizational steps regarding the actual execution of the search, including ensuring that the search was being videorecorded and determining the order in which to analyze the computers in the residence.  In addition, team members were checking the home occupants' immigration status and criminal backgrounds.  So, this was not a situation where officers were standing around doing nothing, hoping and waiting for Ramirez to be embarrassed to the point where he would say or do anything for clothing.

Moreover, as Ramirez's own action demonstrate, Ramirez was not intimidated from requesting the opportunity to get dressed, and, significantly, he had to ask only once, and law

enforcement responded by taking Ramirez to his room, where he was able to dress himself.  Nothing about this sequence of events suggests that law enforcement purposely tried to put Ramirez in an uncomfortable position to reduce his will to resist making a statement or that Ramirez, in fact, was so uncomfortable from the events that, even after he felt secure enough to ask for the opportunity to get dressed and he was allowed to dress himself, his will was weakened to the point where his decision to waive his rights could not be considered voluntary.[5]  Accordingly, the events that occurred before Ramirez was taken to Detective Velazquez's car for his interview did not render involuntary Ramirez's statements during the interview.  *See United States v. Caramian*, 468 F.2d 1369, 1370 (5th Cir. 1972)[6] (confession not coerced where it occurred after *Miranda* warning administered following "abrupt[]" arrest of Spanish-speaking alien who was stripped naked and searched by twelve armed government agents on a New York City street).

B.   *Are Ramirez's responses to the so-called "preliminary questions" asked before Ramirez was advised of his rights admissible?*

Generally, statements that a defendant makes in response to custodial interrogation before *Miranda* rights have been administered are not admissible at trial.  *United States v. Arbolaez*, 450 F.3d 1283, 1292 (11th Cir. 2006) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).  In *Pennsylvania v. Muniz*, 496 U.S. 582 (1990), however, a plurality of the Supreme Court recognized

---

[5]Nevertheless, this Court respectfully encourages law enforcement to plan for the contingency that an occupant of a searched residence may not be fully dressed at the time of the search — particularly when a search occurs in the early-morning hours — so that after the residence is secured, the officers' security has been confirmed, and any onsite emergencies have been addressed, any occupant who is not fully dressed may promptly be permitted to get dressed if he or she wishes to do so.

[6]Pursuant to *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

the "routine booking question" exception.

Under this exception, answers to questions asked for the purpose of securing "'biographical data necessary to complete booking or pretrial services'" are not inadmissible under *Miranda*. *Muniz*, 496 U.S. 582, 600-02 (1990) (plurality); *United States v. Sweeting*, 933 F.2d 962, 965 (11th Cir. 1991). As the Eleventh Circuit has explained, "An officer's request for 'routine' information for booking purposes is not an interrogation under *Miranda*, even though that information turns out to be incriminating." *Sweeting*, 933 F.2d at 965 (quoting *United States v. Sims*, 719 F.2d 375, 378-79 (11th Cir. 1983) (per curiam), *cert. denied*, 465 U.S. 1034 (1984)) (internal quotation marks omitted). To qualify as a routine-booking question, the question must be "reasonably related to the police's administrative concerns," *United States v. Brotemarkle*, 449 F. App'x 893, 896 (11th Cir. 2011) (quoting *Muniz*, 496 U.S. at 601-02) (quotation marks omitted), and the Court must conclude that the question was not intended to elicit an incriminating response. *Id.* at 897 (citing *Sweeting*, 933 F.2d at 965). Among other questions that may qualify for the routine-booking exception are those asking for the name, birthdate, and address of the person being questioned. *See Muniz*, 496 U.S. at 601; *Sweeting*, 933 F.2d at 965. But the Eleventh Circuit has "emphasize[d] that police may not use routine biographical questioning as a guise for obtaining incriminating information. . . . Even questions that usually are routine must be [preceded] by *Miranda* warnings if they are intended to produce answers that are incriminating." *United States v. Glen-Archila*, 677 F.2d 809, 816 (11th Cir. 1982) (citation omitted).

Here, Ramirez objects to the questions requesting his address and the length of time that he had lived at his address. Detectives Velazquez and Azcuy testified that they routinely ask these questions of subjects to establish identity. And, in this case, the law-enforcement officers explained

-11-

that establishing identity was of particular importance because they had not anticipated encountering Ramirez at the residence at the time that they searched it.

On the other hand, Agent Devine is an experienced agent who specializes in cases involving Internet crimes against children, and Detectives Velazquez and Azcuy have served as detectives with the Miami Beach Police Department's Special Victims Unit Internet Crimes Against Children Section. Similarly, Detectives Velazquez and Azcuy have been assigned to the federal task force that investigates child-exploitation cases — Detective Velazquez for seven years. Although the officers denied having asked Ramirez where he lived and for how long he had lived there for the purpose of eliciting incriminating information, all of the officers acknowledged that an important part of any Internet child-pornography case requires establishing a nexus between the computer used to commit the crime and the subject who is ultimately charged.

Significantly, the officers did not explain the administrative purpose of asking Ramirez the length of time that he had resided at the residence or how the answer to that question could help them to confirm Ramirez's identity. Nor did the offense-incident report that Detective Azcuy prepared or the official report that Agent Devine wrote request in the background-information section the period during which the subject had resided at his current address. *See* ECF No. 21-1 at 2; ECF No. 21-2 at 2. Rather, based on the record before the Court, the sole relevance of the question appears to be to the subject matter of the investigation — that is, whether Ramirez was living at the residence where the computer that accessed the child pornography was located at the time that the child pornography was accessed. *See United States v. Pacheco-Lopez*, 531 F.3d 420, 424 (6th Cir. 2008) (holding that question about when defendant had arrived at the house was "reasonably likely to elicit an incriminating response" and therefore required a *Miranda* warning). Under these circumstances,

-12-

the Court concludes that Ramirez's pre-Miranda-rights-waiver answer to the question concerning the length of his residence at the address where he was found must be suppressed.

But the Court does not reach the same conclusion regarding Ramirez's response to the question asking where he resided. The officers credibly explained that they had not anticipated encountering Ramirez at the residence before they searched it. Moreover, officers found a packed suitcase in the room where Ramirez asked to be taken to change. Under these particular circumstances, the Court credits the officers' explanation that they asked Ramirez where he lived in furtherance of determining Ramirez's identity.

In view of the determination that Ramirez's response to the question concerning the length of time during which he had resided at the searched location must be suppressed, the Court now considers whether this suppression has any bearing on the statements that Ramirez made following his subsequent written waiver of *Miranda* rights. The Supreme Court has determined that "even where a suspect, while in custody, has answered unwarned questions from police, the suspect still may validly waive his *Miranda* rights and provide admissible statements after *Miranda* warnings." *United States v. Gonzalez-Lauzan*, 437 F.3d 1128, 1133 (11th Cir. 2006) (citing *Oregon v. Elstad*, 470 U.S. 298, 314 (1985)).

In *Missouri v. Seibert*, 542 U.S. 600 (2004), a plurality of the Supreme Court set forth a test for analyzing the effectiveness of *Miranda* warnings administered for the first time after a defendant has already made an incriminating statement. Under that test, courts consider

> a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the

> continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Seibert*, 542 U.S. at 615 (plurality).  The fifth vote in the plurality did not adopt the test set forth above but instead concluded that the statements obtained following administration of the *Miranda* warnings had to be suppressed under the circumstances of that case because the law-enforcement officers consciously and purposely employed an interrogation technique "designed to circumvent *Miranda* . . . ."  *Id.* at 618 (Kennedy, J., concurring).  More specifically, the officers awoke the defendant in *Seibert* from her sleep at a hospital, where her son was being treated for burns.  They took her to the police station, left her alone in an interview room for fifteen to twenty minutes, and then questioned her for thirty to forty minutes, squeezing her arm and repeating that the victim of the fire that she and her son had allegedly planned "was . . . to die in his sleep" during the fire.  *Id.* at 604-05.  After the defendant finally admitted that the victim was intended to die in the fire, the officers gave the defendant a twenty-minute coffee and cigarette break.  The same officers then turned on a recording device, administered *Miranda* warnings, and obtained a signed waiver of rights from the defendant.  Then the officers had the defendant provide the same statement that she had given before receiving her rights.

The nature of the pre- and post-*Miranda*-rights questioning in the pending matter and in *Seibert* contrasts greatly.  First, the only information elicited here regards the length of time that Ramirez lived at his residence, whereas in *Seibert*, the officers extracted a detailed and complete confession to the crime under investigation.  Second, in this case, the officers asked one closed-ended offending question before reading Ramirez his *Miranda* rights, but in *Seibert*, the officers went on for thirty to forty minutes.  Third, no allegation exists on this record that the officers

-14-

physically touched Ramirez at any period during the questioning or suggested what they wanted Ramirez to say, but in *Seibert*, the officers employed the physical technique of squeezing the defendant's arm and also kept repeating to the defendant what they hoped that she would ultimately say.  Fourth, unlike in *Seibert*, where the police had expressly adopted the questioning strategy of "question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once,'" *id.* at 606, here, there is no indication that the officers asked Ramirez the length of his residence at the address as part of a concerted strategy to undermine *Miranda*.

Finally, significantly, the overlap between the questioning about the length of residence and the post-*Miranda*-rights questioning was minimal.  While the pre-*Miranda*-rights questioning asked only how long Ramirez had lived at his current residence, the questioning after the administration of the rights focused on who used the computer alleged to have accessed the child pornography at issue in the case.  Thus, in contrast to the situation in *Seibert*, where "no circumstances . . . would seem to dispel the effect of the *Miranda* violation," 542 U.S. at 606 (quoting the Supreme Court of Missouri's opinion) (quotation marks omitted), here, at least as it pertains to the pre-*Miranda*-rights question concerning the amount of time Ramirez had lived at his residence, the record does not contain evidence suggesting that Ramirez felt that invoking his rights after the officers read him his *Miranda* warnings would be futile.  Moreover, Detective Velazquez testified that she very carefully and deliberately reviewed each of Ramirez's rights with him, and Ramirez clearly indicated his understanding of each right.  In view of this record, the officers' question asking Ramirez the length of time that he had resided at the residence does not support suppression of Ramirez's post-*Miranda* statement.

C.    *Did the detective's alleged statement to the effect that "it would be worse" for Ramirez if he*

*did not cooperate render Ramirez's statements involuntary?*

Finally, the Court considers Defendant's contention that the detective's statement that "it would be worse" for Ramirez if he did not speak with law-enforcement officers rendered involuntary Defendant's subsequent statement. Upon consideration of binding Circuit precedent in the form of *Hart v. Attorney General of the State of Florida*, 323 F.3d 884 (11th Cir. 2003), and *United States v. Beale*, 921 F.2d 1412 (11th Cir. 1991), the Court agrees with Defendant and suppresses Defendant's statement.

In *Hart*, the defendant was charged with murder and other very serious crimes. At the police station, after the defendant had been read his *Miranda* rights, he met with a detective with whom he was previously familiar and who he stated that he trusted. The detective told the defendant that she had never lied to him and that she would not lie to him then, although, in fact, she did in that she falsely informed the defendant that a video-surveillance camera had recorded the crime. The defendant asked the detective what could happen to him, and she advised him that he could receive the death penalty if he were tried as an adult, which she told him she believed to be very likely. Then the defendant asked the detective whether she would ask for an attorney if she were in his position, and she told him that he had to make his own decision. Following a brief break, the defendant asked the detective what the benefits and drawbacks of having an attorney included, and she opined, "He'll protect you rights. He'll tell you what to answer, what not to answer, and he'll be here for you." *Id.* at 888. As for the disadvantages, the detective stated that the attorney would tell the defendant that he could not answer questions that the detective was going to ask him. Although the detective did not advise the defendant that providing a statement would help his predicament, she did tell him that "honesty wouldn't hurt him." *Id.* at 889. The defendant then gave a full confession.

The Eleventh Circuit held that the statement had to be suppressed because it was not a voluntary statement under *Miranda*.  In reaching this conclusion, the court noted that the Supreme Court has established a two-part inquiry into whether a waiver was voluntary, knowing, and intelligent:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* at 892 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (internal quotation marks and citation omitted)).  Upon considering the totality of the circumstances, the Eleventh Circuit concluded that the defendant's waiver was "the product of deception and was not 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* at 893 (quoting *Moran*, 475 U.S. at 421).  Although the court recognized that the defendant's signed waiver form is "'usually strong proof' that a suspect voluntarily waived his rights," it nonetheless explained that a signed waiver form is not conclusive on the issue.  *Id.*

In the defendant's case, the court emphasized that the detective told the defendant that a disadvantage of having a lawyer present was that the lawyer would instruct the defendant not to answer questions, yet, the court explained, "[t]he reason for requiring a lawyer during custodial interrogation is to protect a suspect's privilege against self incrimination." *Id.* at 894.  In addition, the court exhibited particular concern that the detective's statement that "honesty wouldn't hurt [the defendant]" "contradicted the *Miranda* warning that 'anything he said could be used against him in

-17-

court.' [] The phrase 'honesty will not hurt you' is simply not compatible with the phrase 'anything you say can be used against you in court.'   The former suggested to [the defendant] that an incriminating statement would not have detrimental consequences while the latter suggested (correctly) that an incriminating statement would be presented at his trial as evidence of his guilt." *Id*.

In addition, the court relied on *Beale*.  In *Beale*, the defendant signed a *Miranda*-rights waiver only after the agent told him that "signing the form would not hurt him."  *Beale*, 921 F.2d at 1434. Explaining that *Miranda* warnings must not be misleading, the court reasoned, "It appears that by telling [the defendant] that signing the waiver would not hurt him the agents contradicted the *Miranda* warning that a defendant's statements can be used against the defendant in court, thereby misleading [the] defendant concerning the consequences of relinquishing his right to remain silent." *Id*. at 1435.  Thus, the *Beale* Court ruled that the district court erred in admitting the defendant's statement made after the agent had so advised the defendant.

Similarly, in *Hart*, ultimately the court concluded that, as a result of the detective's deception and her contradictory statements, the defendant did not really understand the nature of his right against self-incrimination or the consequences that would arise from waiving it.  *Id*.  As a result, the court held that the defendant's waiver "was not voluntary, knowing, and intelligent as required by *Miranda* . . . ." *Id*.

Here, a problem similar to the one that arose in *Beale* and *Hart* exists: one of the detectives gave Defendant advice that contradicts one of the *Miranda* warnings.  As in *Beale* and *Hart*, the offending advice implicated the Fifth Amendment right not to incriminate oneself.  In particular, the detective advised Defendant that "it would be worse" if he did not provide a statement.  In fact,

however, the Fifth Amendment provides for the exact opposite.  It protects a person's right to remain silent and precludes a defendant's decision not to give a statement from being used against that defendant.  By instructing Defendant that he would be penalized by not speaking with the detectives and agent, the detective directly contradicted the very right that the *Miranda* warnings seek to safeguard.

Moreover, the instruction provided in this case is perhaps even more troubling than that found to be inappropriate in *Beale* and *Hart*.  In *Beale* and *Hart*, the officers advised the defendants that speaking would not hurt them, which contradicted an express part of the *Miranda* warning — "anything you say can and will be used against you in a court of law."  Here, however, while the instruction that "it would be worse" if Defendant did not provide a statement conflicts with the Fifth Amendment's guarantee that a defendant's silence will not be used against him, no express part of the *Miranda* warning advised Defendant in the first place that his silence could not be used against him.  Instead, the *Miranda* warning instructs only that a subject has the right to remain silent.  Consequently, whereas the officers' statements in *Beale* and *Hart* may have been confusing to the defendants since they contradicted an express part of the *Miranda* rights given, here, nothing suggested to Defendant, contrary to the detective's advice that "it would be worse" if he did not give a statement, that his silence could not be used against him.

Furthermore, Defendant is a Peruvian national who works on cruise ships for a living.  While these facts alone certainly do not negate an otherwise-valid waiver of *Miranda* rights, in evaluating the totality of the circumstances, as *Hart* and *Beale* require, the Court must consider whether these facts may have contributed to any involuntariness of Defendant's statement, under the specific facts that occurred here — that is, where a detective specifically advised Defendant that "it would be

worse" for him if he did not cooperate.  Under these particular circumstances, Defendant's status as a foreign national who makes the bulk of his living on ships that spend their time outside the United States likely further contributed to Defendant's lack of understanding that his decision not to provide a statement could not be used against him.  In short, Eleventh Circuit and Supreme Court precedent require the conclusion that Defendant's statement was not voluntary.  As a result, the statement must be suppressed.  *See Oregon v. Elstad*, 470 U.S. 298, 306-07 (1985).

### *III.  Conclusion*

Fort the foregoing reasons, Defendant Carlos Luna Ramirez's Motion to Suppress Statements [ECF No. 14] and Ramirez's Additional Motion to Suppress [ECF No. 19] are **GRANTED**.

**DONE and ORDERED** at Fort Lauderdale, Florida, this 10th day of January 2014.

_____

ROBIN S. ROSENBAUM
UNITED STATES DISTRICT COURT

copies:          Counsel of Record

-20-